CITY COUNCIL OF THE CITY OF ELIZABETH, A MUNICI-
PAL CORPORATION OF THE STATE OF NEW JERSEY,
PLAINTIFF, v. MICHAEL NATURILE ALSO KNOWN AS
MICHELO G. NATURILE, DEFENDANT.

Superior Court of New Jersey
Law Division

Decided August 20, 1975.

214

216

218

Mr. Luis Bello, argued the motion for plaintiff, Mr. Raymond S. Londa and Mr. Luis Bello, on the briefs. Mr. Frank P. Trocino, City Attorney of Elizabeth.

Mr. Arthur J. Timins argued the motion for defendant.

DREIER, J. D. C., Temporarily Assigned. Plaintiff City of Elizabeth, a Faulkner Act municipality, seeks a declaratory judgment on matters affecting the application of the electrical and plumbing regulations in its administrative code and their interrelation with state law. The issues are (1) whether the provisions of *N. J. S. A.* 45:5A–18(n) require plaintiff to issue an electrical permit to defendant, the owner of property upon which he himself proposes to construct a house for the use of himself or members of his immediate family; (2) whether plaintiff may refuse to receive an application or to issue an electrical permit to any person not a licensed electrician who seeks a permit in the above circumstances (thus challenging the validity of sections 28–12 and 28–53(4) of the plaintiff's administrative code); (3) whether chapter 71 of the plaintiff's code, regulating the business of master electrician, is valid and enforceable, and finally, (4) whether chapter 36 of the code, regulating the business of master plumber, is valid and enforceable.

Prior to May 20, 1975 defendant property owner applied to the proper official for an electrical permit for the purpose of constructing a residence for himself and his family. His application was rejected solely because he was not a licensed electrician. On July 3, 1975 defendant applied to the proper official for a permit to perform plumbing work upon the same premises. That application was similarly denied solely because defendant did not have a plumber's license. This suit ensued. Although some testimony was taken on the return date of plaintiff's order to show cause why the requested declaratory judgment should not be rendered, the basic facts are not in controversy. The city presented no testimony with

respect to the plumbing inspection costs or procedure, but its witnesses candidly noted that electrical reinspections took only about 15 minutes each and that most specific problems could be avoided by additional and more thorough inspections.[1]

I

We consider first the rejection of the permit for electrical work. *N. J. S. A.* 45:5A–1 *et seq.,* the Electrical Contractors Licensing Act of 1962, as amended by *L.* 1968, *c.* 17, is a comprehensive act manifesting a legislative determination that problems of statewide concern had developed in an area of potential danger to the public. Its provisions for a board of examiners and the regulations to be adopted by that board show that the Legislature intended to balance the legitimate needs of those engaging in the business of electrical contracting against the proper protection of the consuming public. Both of those factors were considered and language chosen that would intrude no more than necessary on each citizen's constitutional right to liberty and property. The constitutionality of *N. J. S. A.* 45:5A–1 *et seq.* was upheld by the New Jersey Supreme Court in *Ind. Elec. Assoc. of N. J. v. N. J. Bd. of Exam.,* 54 *N. J.* 466 (1969). Section 18(n) provides that the definition of the business of electrical contracting — which requires one to secure a business permit under the act — shall not include:

(n) Work performed by a person on a dwelling that is occupied solely as a residence for himself or for a member or members of his immediate family.

---

[1]An example given was the use of unreamed conduit through which wire could be drawn, thus injuring insulation. The inspector noted that a licensed contractor would know not to leave sharp edges, while the work of an inexperienced homeowner must be examined prior to closing the conduit joints because of the potential fire danger from exposed wire. Intermediate inspections could solve such problems, and any additional costs (as noted *infra*) could be charged to the applicant, if the city's ordinances are amended appropriately.

Plaintiff claims that it restricts permits to licensed electricians because of the danger to public health which would result from any alternative, and that its ordinance is authorized by *N. J. S. A.* 40:48–1 and 40:52–1, as well as the Faulkner Act, *N. J. S. A.* 40:69A–1 *et seq., N. J. S. A.* 40:48–1 is general enabling legislation, section 13 of that statute permitting a municipality to "regulate and control the construction, erection, alteration and repair of buildings and structures of every kind within the municipality * * *." This section gives the city power to regulate and control the performance of electrical work, subject to the power of the State to preempt all or any part of the field of regulation, and also subject to the requirement that such regulations be reasonable.

*N. J. S. A.* 40:52–1(g) provides authority to license and to regulate various kinds of businesses. However, while the business of electrical contractor was held to fall properly within municipal powers under this section in *Becker v. Pickersgill,* 105 *N. J. L.* 51 (Sup. Ct. 1928), *Salomon v. Jersey City,* 12 *N. J.* 379, 389 (1953), confined this section to cover only "local businesses which may reasonably be considered comparable in type to those specifically enumerated therein * * *" See also, *Weiner v. Stratford,* 15 *N. J.* 295, 300 (1954). Neither the business of plumbing nor electrical contracting is enumerated therein. Also, since defendant is not seeking to engage in the electrical contracting *business,* this section is inapplicable.

It is unnecessary to consider plaintiff's status as a Faulkner Act municipality, since *N. J. S. A.* 40:69A–28 and 30 explicitly gives such municipalities all powers conferred by "general law," which would include the provisions of *N. J. S. A.* 40:48–1(13), already noted, and the broad auxiliary powers of *N. J. S. A.* 40:48–2.

A municipality, however, may not exert its delegated regulatory or police powers in terms which conflict with a state statute, and may not deal with a subject if the Legislature intends its own regulations to be exclusive,

irrespective of whether it exhausts the field or touches only a part of it. *State v. Ulesky,* 54 *N. J.* 26, 29 (1969). In determining whether the State has preempted the field, the question is whether the Legislature intended its action to preclude the exercise of delegated police power. In the case of business permits required for electrical work it is clear that *N. J. S. A.* 45:5A–1 *et seq.* has preempted the field, at least insofar as it defines who may engage in the business of electrical contracting.

Plaintiff contends, however, that the exemption quoted earlier in *N. J. S. A.* 45:5A–18(n) refers only to dispensing with a business permit and not to license requirements. But an examination of the other exemptions listed shows that the common consideration in all of them is a judgment of lessened danger, *e. g.,* specialized work subject to stringent standards by other agencies, proper supervision reasonably to be anticipated by other governmental departments, matters involving very low voltage, or (as with section (n)) the belief that a resident homeowner will exercise due care for the safety of himself and his family — particularly when the final result of the work in all cases will be subject to outside inspection. If one does not need a business permit to do the actual work, *a fortiori* he does not need to qualify for and obtain a license to commence the work. He must be issued a construction permit, subject to reasonable municipal inspection permitted by *N. J. S. A.* 45:5A–17(a).

Plaintiff also would draw a distinction between permission to make minor repairs on an existing dwelling and undertaking the large project of initial construction, claiming that section (n), by referring to a "dwelling that is occupied," contemplates only the former. Such a reading ignores *Sands v. N. J. Bd. of Examiners of Electrical Contractors,* 90 *N. J. Super.* 82 (App. Div. 1966), aff'd 54 *N. J.* 484 (1969), wherein the exempted work was being done by the owner on dwellings to be occupied in the future. This factor was not treated as material by either appellate court. In *Sands,* however, the owner intended to do electrical work

in houses planned for immediate sale. The *Sands* courts did not consider § 18(n) specifically, since the events in question had occurred in 1963, five years before the exemption was added to the act (54 *N. J.* at 486–487). That a building is still under construction is not a ground for distinguishing areas covered by the exemptions is also inferable from the amendment to § 18(k) which in 1968 deleted a former qualification of exempting installation work on "existing buildings" occupied by a firm and replaced it with an exemption for such work on "premises" occupied by a firm.

Moreover, while *N. J. S. A.* 45:5A–9(a) says that "Any single act or transaction shall constitute engaging in the business of electrical contracting within the meaning of this chapter," the concurrent presence of § 18(n) shows that this provision was intended to reach electricians who hire out either to general contractors or to individual homeowners. *Sands v. N. J. Bd. of Examiners, supra,* 90 *N. J. Super.* at 86.

This court finds that the State has preempted the entire electrical contracting licensing area. Were this not so, each municipality could impose varying licensing standards, not only upon defendant but also upon the beneficiaries of every other exemption in the statute. Such a result would impose an undue burden upon government and commerce. Sections 28–12 and 28–53(4) of plaintiff's administrative code are therefore unenforceable insofar as they require rejection of an application for and forbid issuance of a permit to anyone not a licensed (or registered) electrician. The municipality's remedy is to enforce its inspection rights, as will be discussed *infra*.

The court does not reach consideration of chapter 71 of the plaintiff's code because of state preemption of the need for a municipal license or business permit, and because the city regulates only the "business" of master electrician. The "business" aspect will also be discussed *infra* as it relates to the application for a plumbing permit.

## II

We consider next whether plaintiff municipality was justified in refusing to accept an application from defendant for a plumbing permit and in denying the permit in circumstances identical to those outlined above, that is, where defendant was a resident homeowner intending to perform plumbing work on a dwelling to be used as a residence for himself or members of his immediate family.

It is necessary to begin with a consideration of *N. J. S. A.* 45:14C–1 *et seq.*, the State Plumbing License Law of 1968. This act provides for state licensing of a master plumber, which term is defined in part in *N. J. S. A.* 45: 14C–2 as one "engaged in contracting to furnish labor, or labor and materials, for the installation, maintenance, repair, extension, alteration or renovation of plumbing." Section 12 makes clear that the act supersedes *N. J. S. A.* 26:3–31(e) in that one licensed by the state may not be required by any municipality to seek local licensing. The state license permits one "to practice or to be engaged as a master plumber in the business of plumbing in any municipality in this State." Section 14 specifically states that municipalities retain "the power to inspect plumbing work or plumbing equipment [and] the power to regulate the standards and manner in which plumbing work shall be done." Section 24 states that:

Every person who shall not elect to secure a State license hereunder shall remain under the provisions of Revised Statutes 26:3–31 (e) and the licensing and examination of such persons shall be solely governed by the municipal bodies implementing such provisions.

 Reading *N. J. S. A.* 45:14C–1 *et seq.* as a whole, this court determines that § 24 refers only to those persons seeking to engage in the *business* of master plumber who shall be governed by such municipal licensing and regulation. This language must be read against the municipal power in § 14 of the act to inspect and regulate the plumbing work.

We see, therefore, that the act does not by its terms give any municipality the power to regulate *who* shall do the work other than those holding themselves out as being in the business of plumbing. *Cf. N. J. S. A.* 26:3–31(e) (incorporated by reference in *N. J. S. A.* 45:14C–24) which permits the local board of health "to regulate the practice of plumbing." The use of the terms "practice" or "business" by the Legislature appears to exclude the proposed activity of defendant.

The terms "business," "occupation," or "trade," as used in a law imposing a license tax on businesses, occupations, trades, etc., ordinarily mean a business, occupation or trade in a commercial sense carried on with a view to profit or livelihood. * * * In the absence of a statute specificallfiy so providing, the performance of a single act, or even a number of isolated acts, pertaining to a particular business or occupation does not constitute engaging in, or carrying on, such business or occupation within the meaning of a law imposing a license or tax thereon unless an intent to engage in the business is clearly apparent, although where a statute so intends a single transaction may constitute the carrying on of the business or occupation licensed or taxed. * * * A statute imposing a tax on persons who engage in a certain business for hire or profit does not warrant the collection of the tax from a person who performs certain acts pertaining to the business for his own benefit and in connection with his regular business. [53 *C.J.S. Licenses* § 327 at 556–557]

As noted earlier with respect to the electrical work, unless an act is done as a "business" in the sense of being a commercial enterprise for profit, it is not subject to license or regulation by a municipality under *N. J. S. A.* 40:52–1(d). See *Morris v. Elk Tp.,* 40 *N. J. Super.* 34 (Law Div. 1956), where a limitation upon an individual living in a trailer did not come within the municipality's power to regulate the business of trailer parks. See also, *Karnes v. City of Benton,* 258 *Ky.* 425, 80 *S. W.* 2d 558 (Ct. App. 1935), wherein a farmer who slaughtered his farm pigs for his family and sold the excess in a nearby town could not be convicted for selling meat without a license.

As the New Jersey real estate license cases make clear, an isolated transaction (in some circumstances even

where done for strangers) does not constitute being engaged in the particular business. See *Waring v. Jobs*, 104 *N. J. L.* 158 (E. & A. 1927) ; *Wensley v. Godby*, 101 *N. J. L.* 325 (Sup. Ct. 1925). Similarly, in other areas it is the general policy of the State that, although it may require licensing of certain occupations performed by a worker representing himself to the public as skilled and reliable, there is ordinarily no need to protect a private individual or his family from his own acts voluntarily performed for his own benefit. An example already noted is explicit exemption in the Electrical Contractors Licensing Act of 1962, as amended in 1968. It is hardly necessary to point out that even in the highly regulated practice of law, *R.* 1:21–1(a) preserves the inalienable right of a party to appear in court *pro se*. The same state policy is manifest in the Architects Licensing Act, *N. J. S. A.* 45:3–1 *et seq.* Section 10, in defining the illegal practice of architecture, states that

Nothing herein contained shall prohibit * * * any person in this State from acting as designer of a dwelling and all appurtenances thereto that are to be constructed by himself solely as a residence for himself or for a member or members of his immediate family.

The same policy is found in the Professional Engineers and Land Surveyors Act, *N. J. S. A.* 45:8–27 *et seq.* which states that:

Nothing in this act shall be construed as requiring licensing for the purpose of practicing professional engineering or land surveying by any person, firm, or corporation upon property owned or leased by such person, firm, or corporation, unless the same involves the public safety, public health or public welfare.

Electrical work, architectural design and engineering all bear upon safety and health factors in no less a degree than plumbing, yet in each of these areas the State has recognized the right to work upon one's own property where no compelling reason dictates otherwise. The reasoning behind this policy has been expressed in *State ex rel. Rhodes*

*v. Cook,* 72 *Wash.* 2d 436, 433 *P.* 2d 677 (Sup. Ct. 1968), app. dism. 392 *U. S.* 643, 88 *S. Ct.* 2281, 20 *L. Ed.* 2d 1347 (1968), discussing the State of Washington's statutory exemption (similar to those quoted above) from plumbing licensing for those doing plumbing work on their own houses. The court, in refusing to permit a nonresident owner to work on a house he intended to rent out to others, explained

Since it is reasonable to assume that homeowners who do plumbing work for themselves and their immediate families in residence in which they reside or intend to reside, will tend to perform the work more carefully than would those who do plumbing work for strangers, it is reasonable to require certification of the latter class while not requiring certification of the former class. The public health and safety may adequately be protected in the first case by the inherent concern one has for his own welfare and that of his immediate family. This immediate concern may not be present when strangers are to use the premises, and therefore there is no adequate substitute for the certification requirement. We find a logical connection between the object of the legislation, *i. e.* the protection of the public health and safety, and the requirement that one must intend to live in a residence himself if he is to be issued a permit to do plumbing work without first being examined as to requisite skill and certified as a plumbing contractor. [at 680]

We note this decision was made despite the fact that in Washington, as in New Jersey, even one exempt from certification or licensing is nevertheless subject to inspection of the work by local authorities. See also *State ex rel. Lipps v. City of Cape Girardeau,* 507 *S. W.* 2d 376 (Mo. Sup. Ct. 1974) ; *White v. City of Evansville,* 310 *F. Supp.* 569 (S. D. Ind. 1970), where the particular ordinances were noted to contain similar non-business exemptions.

The reasoning of *Rhodes* is quite similar to that expressed in *Berkeley Tp. Local Board of Health v. Johnson,* 73 *N. J. Super.* 384 (App. Div. 1962), which preceded the state licensing act, holding that where even a master plumber who employed other plumbers owned, built and managed numerous commercial and residential units occupied by others, the town's ordinance requiring local licensing was reasonably related to the public health, safety and welfare and

was not an unreasonable interference with the right of defendant to work on his own property or to employ others to do so. However, the number of units and commercial nature of the construction distinguish that case from the one before this court.

## III

But even if there is no implied preemption by the State in the plumbing field and the municipality may not require a business license, may a municipality choose under its general powers to regulate those who may do plumbing work on their own property by prohibiting performance of such work by unlicensed persons?

Every landowner is subject to control of his property for the public good. Private property rights are not absolute; they are always subject to the reasonable exercise of the police power. *David v. Vesta Co.*, 45 *N. J.* 301, 311 (1965). The right of private property must yield to the common good, and when interfered with or restrained, the assumed injury to the individual is presumed to be offset by the benefit accruing to him as one of the public at large. *Lincoln Park v. Cullari*, 15 *N. J. Super.* 210, 215 (App. Div. 1951). The municipality has the authority to impose limitations upon the use and enjoyment of private property under its inherent police power to promote the safety, health, morals and general welfare of the community. *Devine v. Mantua Tp.*, 28 *N. J. Super.* 299, 304 (Law Div. 1953), and the municipality may exercise its police power before harm has befallen. *Mason v. Hillsdale-Mayor and Council*, 53 *N. J. Super.* 500, 504 (Law Div. 1959). Usually, this power is strictly limited to matters of local concern and is not applicable to matters involving state policy. *Galante v. Teaneck Dept. of Health*, 70 *N. J. Super.* 362, 368 (Law Div. 1961). However, even if the evil to be combatted is of statewide concern, practical considerations may warrant different or more detailed local treatment to meet varying conditions or to achieve the ultimate goal more effectively. *In-*

*ganamort v. Fort Lee*, 62 *N. J.* 521, 528 (1973). Unless there has been a general preemption of the field, the fact that the State has licensed a particular calling may not be enough to bar local licensing to protect traditional values of local concern. *Summer v. Teaneck Tp.*, 53 *N. J.* 548, 554 (1969).

■ ■ Municipal enactments should be sustained when they bear a reasonable relationship to the end to be accomplished, namely, safeguarding of public health, safety and morals, and when the method adopted to meet the problem is reasonably designed to accomplish the end. *N. J. Const.* (1947), *Art.* 4, § VII, ¶ 11; *Toms River Pub. Co. v. Manasquan*, 127 *N. J. Super.* 176, 181 (Ch. Div. 1974); *Elizabeth v. Sullivan*, 100 *N. J. Super.* 51, 55 (Cty. Ct. 1968); Municipal measures designed to deal with problems of public health should not be disturbed unless palpably unreasonable or in conflict with some statutory or constitutional limitation, *Marangi Bros. v. Ridgewood Bd. of Com'rs, of Village of Ridgewood*, 33 *N. J. Super.* 294, 301 (App. Div. 1954), and the means chosen must be reasonable and substantially connected with the public interest designed to be advanced, *Mogolefsky v. Schoem*, 90 *N. J. Super.* 49, 57 (App. Div. 1966), mod. on other grounds 50 *N. J.* 588 (1967).

■ We have seen earlier that neither *N. J. S. A.* 45: 14C–1 *et seq.*, 26:3–31(e), 40:52–1(g) nor 40:48 enable a municipality to require a license of one who is not engaging in a business but acting for his own benefit and private use. Plaintiff nevertheless contends that its status as a Faulkner Act city permits it to make a legislative judgment supplementing state law, or to enact this ordinance based upon its general police power in an area not dealt with by the State.

■ ■ In the circumstances of this case, this court disagrees. Even granting that under the Faulkner Act, *N. J. S. A.* 40:69A–29 gives wide powers to a municipality coming within its provisions, there must nevertheless be a reason-

able connection between the ordinance adopted pursuant to the act and the municipal objective. See *State v. Boston Juvenile Shoes,* 60 *N. J.* 249, 257 (1972), striking down portions of a sign ordinance the court found too burdensome and poorly related to the generally praiseworthy object of the ordinance. There must be a substantial connection between the *means* invoked and the public interest to be advanced by an ordinance. *Mister Softee v. Hoboken Mayor and Council,* 77 *N. J. Super.* 354, 366 (Law Div. 1962). Otherwise the licensing provision constitutes an unwarranted intrusion upon property rights. *Howell Tp. v. Sagorodny,* 46 *N. J. Super.* 182, 189 (App. Div. 1957), aff'd 25 *N. J.* 502 (1958). It must appear that the public interest requires such imposition upon private rights, and that considering alternatives open to the city, the means are reasonably necessary for accomplishing the purpose and not unduly oppressive to individuals.

* * * [C]onstitutional due process and equal protection ordain that the authority vested in the municipality * * * shall not go beyond the public need, or impress unnecessary and excessive restrictions upon the use of private property or the pursuit of useful activities * * *. [*Kent v. Mendham,* 111 *N. J. Super.* 67, 77 (App. Div. 1970)]

See also, *Green v. Shama,* 217 *N. W.* 2d 547 (Iowa Sup. Ct. 1974).

As noted in *McQuillin, Municipal Corporations* (3d ed.), § 24.338 at 249–251:

Plumbers and plumbing are subject to reasonable municipal regulation under the police power to protect the public health and welfare. Obviously, good plumbing is intimately connected with the prevention of diseases and epidemics, the prevention of water contamination and the prevention of foul-smelling conditions and damage to buildings from leaking water. Such ordinances, furthermore, must be reasonable, provide a uniform rule, and avoid unfair discrimination.

Under *N. J. S. A.* 26:3–33 local boards of health may require plans of plumbing work to be submitted for approval and may charge a fee for the plan inspection. The

board has the right to regulate the standards for materials used and manner of installation. *Johnson v. Belmar,* 58 *N. J. Eq.* 354, 355 (1899); *Elizabeth Bd. of Health v. Dickstein,* 67 *A.* 89, 90 (N. J. Sup. Ct. 1906).

 Plaintiff city has a department of health, welfare and housing, as well as a board of examiners and a plumbing inspector. Plaintiff has not claimed that its inspection of plumbing work is so inadequate that, in order to protect the public health, it must rely upon a presumption of proper work which could only rest, if at all, upon the licensing of the performer. We may therefore assume that the plumbing inspector will in fact make a proper inspection first of the plans and then of the final work before granting approval. Expecting that the dwelling will not be granted a certificate of occupancy until the inspector does approve the plumbing work, this court sees no manifest danger to health in allowing the resident owner to perform the work himself.

 We note that unlike plaintiff's code provisions dealing with permits for electrical work (which explicitly state that no permit will be given to anyone other than a licensed electrician), the code provisions dealing with plumbing vary in terminology, referring sometimes to "master plumbers" and at other times to "plumbers." Since prosecution and conviction for a violation of a law requiring a license will lie only where the accused's conduct comes within the condemnation of the statute or regulation sought to be enforced, *Sands v. N. J. Bd. of Examiners of Electrical Contractors, supra,* 90 *N. J. Super.* at 85, it is possible to construe plaintiff's ordinance § 36–7 (which requires merely that the filed plumbing plans be "signed by the plumber") to mean that a permit shall be given to any person performing the work of "plumber" whose plan is approved. However, since plaintiff has stipulated that it interprets its code to mean that no application or permit would be issued to anyone but a licensed plumber, this court will adopt that construction of the ordinance. The court need not consider whether chap-

ter 36 of plaintiff's code is valid and enforceable insofar as it regulates the *business* of master plumber, but insofar as it is interpreted to require rejection of an application and refusal of a permit for defendant to construct his own dwelling on his property for himself or members of his immediate family, it violates defendant's property rights.

A legislative measure that, in purported service of the common good and welfare, goes beyond the public need is not effective to curtail personal and private property rights guaranteed by the Constitution. [*Reingold v. Harper*, 6 *N. J.* 182, 192 (1951)]

The court therefore is obliged to find that this exercise of power by the City also has been in a manner not within the contemplation of the Legislature, and therefore must be restrained within proper bounds and set aside. *Itzen & Robertson, Inc. v. Oakland Bd. of Health*, 89 *N. J. Super.* 374, 383 (Law Div. 1964), aff'd 92 *N. J. Super.* 241 (App. Div. 1966).

The court may take judicial notice of the fact that plaintiff was recorded in the 1970 census as having a population of over 100,000 persons. Under *N. J. S. A.* 26:3-32 the board of health in such a city may charge a reasonable fee for any permit not otherwise specifically provided for in the body of the act. It likewise has power to do this under the authorization of *N. J. S. A.* 45:14C-14. The city may reasonably anticipate that one inexperienced in plumbing work may require longer or additional inspections prior to receiving approval of the work than a licensed plumber might require. The city may charge accordingly for such additional work.

[There is] no reason why those who are to be inspected should not pay a reasonable fee for the inspections to insure compliance, or why the cost of such inspections, even though required by other laws or ordinances, may not properly be an element in determining the reasonableness of the fees imposed by a municipality's general licensing ordinance. [*Belleville Chamber of Commerce v. Belleville*, 93 *N. J. Super.* 392, 398 (App. Div. 1967), aff'd 51 *N. J.* 153 (1968)]

This applies as well, of course, to any extra inspections of electrical work which may be required of those applicants who are not licensed electricians.

 Plaintiff municipality must issue applications to defendant for both electrical and plumbing work, and upon filing and approval (which must not be unreasonably withheld) of the plans for each, must issue a permit for the work.

The court will, however, grant a 30-day stay of the order to enable the city to consider an ordinance to defray anticipated expenses of inspection of work performed by non-licensed electricians or plumbers who own the property upon which they intend to construct or repair a dwelling used or to be used solely as a residence for themselves or for a member or members of their immediate families, or any appurtenance thereto; and to establish any necessary administrative procedures for scheduling such inspections.